21-1048 et al. Don't Waste Michigan et al. v. U.S. Nuclear Regulatory Commission and United States of America. Ms. Kern for the petitioner, Fiona Cleary. Mr. Taylor for the petitioner, Don't Waste Michigan et al. Mr. Tanner for the petitioner, Catherine Landon-Minales-Lindsay. Mr. Eberbach for the respondent, Mr. Faft for the intervener. Ms. Kern, before you begin, I'd just like to note that today marks the first day of sitting for our newest colleague, Lawrence Pan. Judge Pan, welcome to the D.C. Circuit. Thank you. Please proceed. Good morning, Your Honors. My name is Diane Kern. I'm here for Beyond Nuclear with me on the front row. In the front row is my co-counsel, Rudy Goldstein. I'd like to take seven minutes from my opening argument. In this case, all parties agree that the NRC issued a license that would violate the Nuclear Waste Policy Act if one of its conditions were fulfilled by allowing the licensee to rely on contracts with the U.S. Department of Energy to take federal ownership and financial responsibility for in-owner spent fuels stored at the licensee's private facility before the opening of the federal repository for permanent disposal. The only issue before this court is whether you should disregard the plain terms of the license condition as suggested by the NRC based on extraneous promises by the agency that fulfillment of the unlawful condition will never be carried out or allowed unless and until Congress changes the law. Forget about the extraneous promises. Let's just look at the face of the condition. It can be lawfully satisfied to the extent they are taking waste from privately owned waste for which a private entity has title. That's absolutely true, Your Honor, and the license contains language that would allow private fuel in-owner storage partners to store federally owned spent fuel. It's our position that every word of this license has to be read. The license condition has to be fully enforceable. Well, that's what you say. You say that's your position, but what supports that? Why? Why? Could I finish my sentence? Why? What is it that requires that every part of the license provision be enforceable? Sorry, Your Honor, I couldn't hear. I'm sorry. What is it that says, you said you believe that all provisions of the license requirement must be enforceable, but what requires it? What do you cite for that proposition? It is the private fuel storage case cited at page 8 of our reply brief. This is NRC's own jurisprudence that license conditions should be fulfillable at the time the license is approved. The point of a license condition is that it should be something that's easy to fulfill administratively without having to question what the law might be. Well, one of them is easy to fulfill, right? Sorry? One of them is easy to fulfill. Yes, but all the words of the license must be… You keep stating that, but I'm asking you what your authority is for that. My authority is the Administrative Procedure Act and the NRC's own jurisprudence. Let's start with the Administrative Procedure Act. What in that requires that every word be enforceable? The NRC may not act contrary to the law. Why are they acting contrary to the law? They say, what's contrary to law here? They have approved a license that would allow the licensee to take unlawful conduct, that would approve unlawful conduct under the Nuclear Waste Policy Act. There's no temporal exception in the Administrative Procedure Act. It doesn't say if the law changes in the future, it's okay to put an unlawful condition in right now. The law has to be met at the time of licensing. That's basic APA requirement that the agency may not act contrary to the law. And in this case, the NRC has admitted that its whole purpose here is to create a license that is valid now, that does not need to be amended in the future. So they can't have it both ways. They can't tell you, well, you can disregard this unlawful language now, but it's going to be effective if and when the law changes so that this company can bid for NRC contracts without having to amend the license. That's on page 468 of the NRC's decision. Suppose you're correct that the language in the license seeming to authorize arrangements for government-owned waste is unlawful. But there's still the other language authorizing arrangements with privately-owned waste, and you have no argument against that. Why wouldn't we at most just excise the offending language and sever the rest? There's no reason why the provision can't operate as applied to privately-owned waste. Your Honor, it would certainly address our concerns about the language of the license if you were to sever the unlawful language, and that is a very well-accepted remedy in the court. The only problem here is that we also ask the NRC not to go ahead with this licensing proceeding in the first place because the license applicant was asking the NRC to take action that was contrary to the Nuclear Waste Policy Act. That would not be resolved, and we would ask you to declare that the NRC should not entertain license applications that are clearly unlawful. At the time, we asked the NRC to sever to tell the applicant that you may not include that provision. Excuse me. Why, if we granted the relief that Judge Gantz has suggested, wouldn't that solve the problem completely? It would not solve the problem that the NRC went ahead with a licensing proceeding that took many years that included an unlawful provision. But if the unlawful provision is gone, what's left? What's left is that the NRC has stated that it can issue a license that violates the law if the law changes, and that's where we get to the separation of powers problem. Before you go to separation of powers, let me just give you a slight modification of Judge Gantz's question. Suppose we said, instead of excising that provision, suppose we said in our opinion that our opinion denying the petition is based on the assurances of the United States government that the unlawful provision will never be implemented. Wouldn't that do it, too? Your Honor, I still think that the law requires the NRC to issue a license that is lawful at the time of issue. So then your answer to Judge Gantz's question is no, right? No. It wouldn't satisfy. No, but severing that provision would address the problem significantly. May I ask a question? Ms. Curran, I think there might be a more simple way to approach this issue, and that is by focusing on the language of the contention that Beyond Nuclear filed. And so we are here reviewing the commission's decision to uphold the board's decision to reject the contention. And the words of the contention are as follows. The proceeding must be dismissed because the central premise of ISP's application, that the U.S. Department of Energy will be responsible for the spent fuel that is transported to and stored at the proposed interim facility, violates the NWPA. That was the contention. So on its face, doesn't this contention fail to raise a genuine dispute about a material issue? Because it says the central premise is that the DOE will be responsible for the spent fuel that is transported and stored at the proposed interim facility. It doesn't acknowledge the alternative way. And so it's not the central premise. And so this contention was correctly rejected. We don't have to get into any of these legal arguments about, you know, is this a legal thing or not. This contention fails. Your Honor, the basis for the NRC's rejection of the contention was that there's no legal dispute that the license provision is currently unlawful. But the provision could never be fulfilled because the NRC and DOE would forbear from doing it. The commission said in its ruling, beyond nuclear has not shown error in the board's interpretation of the legal force of the disputed license condition. Why can't we just uphold that and say your contention fails? That's where catch 22 comes in here. The NRC said, when we file a hearing request, we have to show there's a dispute with the license applicant about what the law requires. And the NRC said, well, there's no dispute here. Everyone agrees that this license condition would be unlawful under current law, but nobody's going to fulfill it or enforce it. So we were caught in a catch 22. We can't win that game. Well, my understanding is, in the board's decision, it noted that you filed your contention. The NRC said there's no dispute about the illegality of one portion of this. And you didn't amend your contention. So the contention that they rejected fails. You didn't amend your contention to take this into account. So what we have before us is a contention that was rejected and apparently properly so on its face. I don't know that we need to get into any of this other argument. But the contention said that it was the central claim of the license application. And that is a proper reading. And the central claim is invalid. That DOE can store spent fuel. We didn't know this. It's not the central claim because there's an alternative way to fund this, which is through people who are, I guess, non-DOE kettle holders, spent fuel. So it's not the central premise. And your contention failed. The contention said that there is a claim in this license application that violates the Nuclear Waste Policy Act. We did not contest the lawful part of the license application that would allow private storage of spent fuel. I understand what you intended, but you didn't say that in your contention. And the contention on its face, in my opinion, seems inadequate. I also want to point out that we filed a motion to dismiss the entire proceeding. And the NRC deferred it. The NRC's hearing notice is supposed to allow us an opportunity to litigate whether the license application fulfills the NRC's regulations for protection of health and safety. The issue of whether this license included a provision that violated the Nuclear Waste Policy Act was not really encompassed by the hearing notice. Therefore, we filed a motion to dismiss the proceeding, which the NRC refused to deal with. It would not rule on our claim. In fact, we're going to buck this to the licensing board. Our claim was not a dispute over whether NRC satisfied the NRC's, whether ISP satisfied the NRC's safety requirements. It was a threshold claim that the entire proceeding was unlawful. And we're asking you to rule on that threshold claim. I understand. But are you conceding that if the contention fails, then all that's before us is your motion to dismiss based on this? Yes. Okay. Thank you. Thank you. We'll give you a few minutes. Mr. Taylor? Mr. Taylor? May it please the Court. I'm Wally Taylor, representing the Steel Club and a coalition led by Don't Waste Michigan. Terry Lodge actually represents Don't Waste Michigan, and he's here in spirit. But we briefly briefed this case at the Court's direction, so I'm arguing for all of the parties. We raised several issues relative to the contentions we filed in the NRC adjudicated proceeding. We also filed separate petitions for review regarding the Environmental Impact Statement. Yeah, I want to ask you about those. You have, as I count, seven of those, right? You have seven challenges to the Environmental Impact Statement. Yes. And are this Court's November 10 order directed that you include in your briefs an argument about jurisdiction? Right? Yes. And you didn't, right? Not in the initial brief. Was there a reason for that? Pardon? Was there a reason for that? Um... Why didn't you do it? Primarily because of the word limitation. But you were under direct order to include a jurisdictional discussion in your opening brief. Yes. We just overlooked it, Your Honor, and we're concerned about getting all of our arguments in the word limit. And do you know that, I mean, I know you've got eight pages on it in your reply brief, but are you aware of this circuit's case law that raising arguments in a reply brief for the first time is unacceptable? It's a waiver of the argument. Well, we were responding to the argument of the NRC and the United States. But your jurisdictional argument should have been in your opening brief. It's too late to include it in the reply brief, and I didn't even see in your reply brief any explanation for this. Usually when a party waves or fails to that, they put in an argument about trying to explain to the Court, well, we had these problems, you know, it's not jurisdictional. But you have none of that. In fact, your reply brief doesn't even acknowledge. The government pointed out in its brief that this Court had ordered you to include the jurisdictional analysis in your opening brief. You hadn't done it, and the government says that's sufficient alone for us to dismiss these claims. No response to that in your reply brief. Of course, the Court can address the jurisdiction issue at any time. But we would ask the Court to objections to that jurisdiction are not forfeitable. Assertions of jurisdiction are forfeitable. That's my explanation, Your Honor. I'm sorry. Well, why don't you go ahead? I mean, the Court will decide this question, but you heard my question. It looks to me like just a classic forfeiture of an argument. It's not even that you failed to include it until your reply brief. It's that you were directly ordered to include it in your opening brief, and the government invoked waiver, and you didn't respond. It's difficult for me to see how this Court can hear any of those claims, challenges to the EIS. Well, in the few seconds I have left, I would note that we— Well, then let me just help forward your argument. So you have six—if that's right, that leaves six challenges to the denial of intervention. That's the way I count it. You have six separate challenges to the denial of intervention. Which of those do you think—and those are probably before us. Which of those do you think—which one is your most persuasive? I was going to argue the transportation issue, Your Honor. That's the most persuasive? I believe that's the one that—Steel Club and Go West Michigan both— Well, why don't you speak about that? Sure. Okay? Yes. That was Steel Club's contention number four, and we presented the expert opinions of Dr. Marvin Resnikoff and Dr. Gordon Thompson. ISP's environmental report, sections 4.2.6 and 4.2.8, did not adequately address those opinions. The environmental report does nothing more than create a dispute, justifying an evidentiary hearing, and that's sufficient for a contention to be admitted. We did set forth the standards for admission of contentions. The contention also— Well, the commission said—and I understand what the commission said about this. It said—I mean, I get your point. Transportation is a big part of this. But the commission said that ISP had identified a dozen representative routes, a dozen representative routes, and you know where to explain why that analysis was the thing. And you haven't said in your brief why that commission's finding about the inadequacy of the response was arbitrary and capricious. There were two problems. First of all, there was a claim that transportation issues are irrelevant. And then also that— Could you answer my question about the representative routes? Sure. Specifically, please respond to that first. You didn't explain—you didn't say to the commission why you thought there was anything wrong with that analysis, right? We—I think we pointed out that the agency and ISP can't get by with saying, well, we don't know where the routes are going to be because the weights haven't been shipped yet. But our argument is that it's going to be by rail. We know where the rail lines are. So there's—it doesn't take much imagination to know where the impacted communities and individuals will be. And that's why we felt that the commission was wrong in arguing that because the routes haven't been officially designated, that it was okay for ISP to just say that we don't know where the routes are going to be, so therefore we don't have to consider transportation. Are there any other of these six you want to focus on in your time? The—and as far as our contention on the transportation, those are the two main points. We did address the allocations in the environmental report with expert testimony, and that is sufficient for the admission of the contentions and that the routes are well enough known that we can say that ISP should have done a better job and that the commission should have—I should have allowed that contention to end up in the evidence. We're into your rebuttal time, so. You are Mr. Canner for Baskin? Yes. Good morning, Your Honor. Good morning. And may it please the Court, Alan Canner for petitioners Baskin Land and Minerals and the Permian Basin Land and Royalty Owners. With the Court's permission, I reserve four minutes. The NRC errs in denying Baskin's motion to reopen the records and file a new contention based on new information in the DEIS that was not in ISP's environmental report. The information was that the privately titled waste would not involve reimbursement to local government for emergency response and preparedness, as well as for infrastructure improvements. As you know, the original filing was for a DOE-only facility with DOE transportation standards, which are stricter than NRC's general standards. Baskin's new contention was focused on local site-specific impact and local cost-benefit analysis, which NRC is obligated by its regulations to evaluate. Specifically, we focused most of our new information on the stretch of the Permian Basin within the 50-mile radius of this facility. We, and the NRC and ISP, agreed that that route will definitely be used. In that sense, the focus on site-specific information distinguishes our claim from that of the Sierra Club, which is talking about national information. What we're looking for in the site-specific information is the fact that we don't really fully know what the rules are going to be, but they are obligated to at least explain the local issues with respect to emergency preparedness. Mr. Kanner, why weren't all of your claims ascertainable from the ER, from the environmental report? It wasn't ascertainable. I mean, I think the assumption was that DOE standards would apply across the board. The DOE transport standard would be utilized across the board. But the ER didn't say that. The NRC says we shouldn't see this coming. We shouldn't see this coming. Right. I think it's just as likely that it would have been the DOE's regulations. And frankly, this ascertainability is not a part of the rules that we're dealing with here. They just ask if the language is different. The order we're appealing from, from the Commission, specifically says we agree the language is different. You need to show good cause, right? Say again? Sorry, you need to show good cause. Yes. Part of that is that the contention wasn't fairly apparent. Correct. I don't want to fight over the adjective. Correct. And we also feel that this was, unlike many other NRC proceedings, this was a brand-new thing. CISM. There are regulations for the creation of an ISSI, such as we have in the Bull Creek case. And they said Congress knew about this. There are also regulations for an MRS. This was new. It was constantly changing. The NRC in its order said, well, we can't stop them from changing the application. So I think that to shift the burden of ascertainability to us, in addition to the other burdens, just doesn't make sense in the context of this language, the pedigree of the program over time. The environmental report on its face contemplates that this might have shipments involving DOE waste, or you might have shipments involving private waste. Indeed, the latter one, as we discussed earlier, is the only one that could happen. Correct. DOE would be responsible, as I understand it, for making the safety arrangements if it's DOE waste, but not otherwise. So why doesn't that pretty clearly signal that someone else is going to have to make arrangements for safe transportation if it's privately owned waste, and if that's not the federal government, who else is it going to be? I'll tell you exactly why later. Congress looked at the issue of transportation in the NWPA. They looked at transportation with respect to taking it to the final repository. This is not that. Congress concluded the title should go to DOE, and they should be responsible for transportation. There's this whole license predicated on Congress changing the law to allow DOE to put its waste in a privately owned facility and commingle it with privately owned waste, privately titled waste. My position is, why wouldn't that law allow retired DOE to do all the transport? DOE has a slew of regulations that are much stricter than anything NRC has done. To say that that is an unreasonable assumption, and even to get into the subjective state of mind of people filing contentions, I find sort of inconsistent. So, I'm sorry, are you saying there is a legal requirement for DOE to arrange for safe transportation even when the waste is privately owned? Or are you saying that's just so obvious that you couldn't even foresee that the states might have to- If you were shipping to the final repository, if we all agree the law is that DOE would do the shipping, and if we also agree that this license has a hypothetical in it, let Congress pass a law allowing DOE to ship waste, well, it follows that they would probably have DOE take title to that private waste. But, I mean, it's no secret that we're talking about something other than shipment to the final repository. The Yucca Mountain's been on ice for 20 years. Yeah, but are we really? I mean, Congress, with Yucca Mountain and the NRC, Congress decided it should go to a single-use location, DP of all school repositories. The NRC is now saying, we can put this on top of a permeant base where all the gas activities are going on, we can put it basically on a parking lot, we can put these gas on top of a parking lot. I don't know that one could reasonably assume that transportation would be left to private parties. As your Honor recalls, from Bull Creek, there was a facility that was created. It ultimately was not usable because of different issues, but do you really think any private entity or utility would take the risk of shipping this waste? There's going to be a change in the law. They're going to have DOE do the shipping, just like they did in the NWPA. That is not a far-fetched reading of this application, one that is unique. And so I think a little bit of deference, and ever-changing, as the NRC admits. So a little bit of latitude, I think, is owed to the Petitioner, who's trying to focus on site-specific issues, which the NRC says are essential in their regulations. There are numerous places where they say that. We raise site-specific issues, and they refuse to hear any of that. All we request is that we have an opportunity to hear this. One of the problems, Your Honor, you said earlier, and I'm not second-guessing or arguing outside my lane, you suggested, well, we could just excise the DOE part and go forward. The only problem with that is you have to understand the history of this proceeding. It started as a DOE-only facility. When we started commingling with private waste, we necessarily created a certain element of confusion. The burden was on ISP, or the NRC, to clarify for people, because NEPA, the Atomic Energy Act, all require people to have an opportunity to participate. If they're not going to be clear in the first instance, if they're not going to be clear, just face it. If you're going to file a contention, you're supposed to go to the environmental report, right? You're supposed to, like, look at specific language, object to that language, explain all the information that you're going to use associated with that language. Where would we have pointed to in the environmental report that says, in fact, there would not be money for emergency response preparedness for private and federal waste? And if there's not, that changes the cost-benefit analysis. Right now, the NRC said it's a small-to-moderate benefit in this area, in the Permian Basin, to have this facility here. Presumably, I guess, taxes or something. Nobody can say that with a straight face. I mean, when you tell me Taylor's declaration, this is a huge burden, a huge burden on the community. Thank you. Judge Tatel, anything else? No. Thank you. We'll give you a minute or two, and we'll vote. Let's hear from the government. Whenever you're ready. May it please the Court. My name is Andrew Averbeck, United States Nuclear Regulatory Commission. I appear today on behalf of both the NRC and the United States. Each of the petitions for review in this matter should be dismissed and denied for a variety of reasons ranging from a lack of jurisdiction. Could you try to speak up? Yeah, I'm in trouble, so. The podium adjusts, also, if that's easier for you. Each of the petitions for review should be dismissed and denied for a variety of reasons ranging from a lack of jurisdiction to a failure to identify that will improve any error by the agency. I'd like to begin today by talking about the court's jurisdiction to review the NRC petition. I just have, before you get into jurisdiction, I just have a factual question. So, maybe you can answer it. This site's going to have about 40,000 tons of waste, right? Isn't that right? And there's another one 40 miles away that's going to have more waste. Is that right? That's generally correct. I would just know that this is the first phase of the first facility, but there is potential for expansion. Yeah, I understand. Is this all the nation's current nuclear waste from power plants or a percentage of it? It's a substantial percentage. I don't have the exact figures, but it is a lot. And certainly the amount of nuclear waste that gets generated increases over time because of our operating budget. But this is a substantial amount of nuclear waste that has been generated. Let me begin with jurisdiction. Because I think that provides the lens through which to view all the issues that have been discussed today. And I'll begin by saying that under the Hobbs Act and the Atomic Energy Act, this court's jurisdiction to review licensing decisions of the NRC, i.e. proceedings in which we grant a license and for which a hearing is available, requires a petitioner first to come to the agency and invoke its adjudicatory proceedings under 10 CFR Part 2. And this court stated in NRDC versus NRC that the way to get to this court is to submit admissible contention. And I'll note that there are sort of two offshoots of it. One is that if you're admitted to the proceeding, then you get to appeal the final license that's issued by the NRC. If you're not, then we're in a situation where you have the immediate right, within 50 days of the denial of the request to intervene, you have the right to seek review of the agency decision that denies the request to intervene. And that's what, in the main, the petitioners did with regard to their first ways of petitioning. And we don't deny that those petitions for review are properly before the court. But with regard to the second way, the ones pertaining to the license itself or the EIS, those are not matters that are appealable to this court, because the sole remedy for someone who's not admitted as a party is to seek judicial review of the decision denying party status. Now, that has immediate consequences for this case. It has two sets of immediate consequences. The first is that petitions that are referred to as the follow-up petitions, that postdate issuance of the license, those, the court should dismiss without contestation. And let me just note with respect to that, that on page four of the reply brief, Don't Waste Michigan and Sierra Club do assert that, well, this rule that I've articulated somehow doesn't apply to NEPA claims because the NRDC case didn't involve NEPA. I just want to point out to the court that that's not correct. In fact, the only issue that was before the court in NRDC was a NEPA issue. The court made a statement that I refer to here, talking about how to get to this court, you need to provide admissible attention. But the second takeaway from the sets of rules that are articulated and their applicability to this case, is that the court's review here is confined to the question about whether the agency acted reasonably when it denied admission of various requests to intervene. And when considering that question, we need to understand that what the agency did there was to interpret its own rules concerning extensive admissibility and in particular 10 PSR 2.309, and in applying those rules to the various contentions that were raised. Now, petitions have raised a number of arguments in their briefs, and we've heard some of them today as well, suggesting that somehow the NRDC's rules aren't fair. Well, I want to make clear two points of that. First, that's not what this case is about. This case is about the application of the NRDC's rules to the NRDC's application of the rules to this particular set of circumstances. And while this court has repeatedly endorsed the NRDC's rules, it has ultimately been monotonous. I understand that. And I know I promised two points, but I'll raise a third one too. And this argument doesn't address the beyond nuclear arguments or the FASC. Well, I think it's fair to say that that question raises a question of law that the agency looked at de novo. And in that sense, we're not talking about a vision of application of rules. We're not talking about arbitrary and suspicious review or use of discretion. We're talking about the agency's legislation. And I certainly am happy to speak to that if the court has questions about it. I mean, you can use your time however you want. I think it's just narrowing the scope of what's before us for one of the three petitioners. So you're going to have to address each of the three pieces anyway. Let me just finish the jurisdictional point, and then I'll move from one to the next. The idea that's been asserted here is that somehow the environmental impact statement and judicial review or comments on the environmental impact statement and judicial review is incorrect. And the reason I say that is because the rules are set up, and again, this is rules that have survived this court's scrutiny. I'm sorry. I didn't understand what you just said. That somebody's arguing they're immune from judicial review? The argument has been raised that the NEPA comment process is essentially a dead end for petitioners who seek judicial review of the condition of those comments. And I want to make clear that that's not the case. Is your point that we don't have jurisdiction over the challenges to the environmental impact statement? That's one of my points. That's your point, right? Yes. I'll move on from that then. Okay. I think we got that. All right. Let me begin with the non-nuclear issue. And I want to make clear that the provision at issue here is not a grant of authority to the NRC to do anything. Rather, it's a restriction on what – not a grant of authority to the licensee to do anything. It's a restriction on what the licensee is permitted to do, and it's a means of ensuring that the NRC's mission necessitates that there is financial assurance provided by the licensee that they're not simply going to walk away, that they're not going to declare bankruptcy tomorrow and leave the nation with suspended weight. So what they've done, or what the agency did, is to address contingencies that may arise, perhaps because Congress decides to revisit this issue, and to make clear that no matter who the title holder is of the fuel that's being stored, that there will be financial assurance provided so as to ensure the public health and safety. And that's what the NRC is in the business of doing. This condition is a means not of granting a firm of authority to do more than what the law requires, but rather to just make sure that there's no concern that the licensee won't have funds to ensure health and safety. So I was wondering if – the position that you're stating now is also what is reflected in the Commission's ruling on this issue. I was just wondering if we owe any deference to an agency's interpretation of its own license, a license that the agency issued. That doesn't seem to fall neatly into any of the deference doctrines, yet it seems to be something that the agency issued. The agency has stated what it meant when it issued the license, and I just am wondering if we owe any deference to that. I don't know that a traditional deference doctrine applies, but as the Court's question before I think suggests, the NRC will abide by the representations it makes to the Court where that representative has a statement in a judicial decision that we expect the NRC to adhere to. It's a statement made in its Commission decision that it will authorize the storage of DOE-titled fuel if that's illegal, as long as it is. So in that sense, I think that the Commission's statement that this is not permissible is entitled to deference. For the DOE to take title to fuel, would it have to go through the NRC? Would the NRC have to approve that? DOE takes title to the fuel. Because you're saying that you would stand by what you said in your license, but I'm wondering if you have any role in that. I think that it's a technical matter. This is outside the purview of the NRC's jurisdiction as to what DOE is or is not doing. But what I can say is that the licensee's requirement is to provide proof of contract, and if the contract that it relied on in order to satisfy the Commission were illegal, the NRC would say, no, you can't give this to us. This isn't enough. You can't be, you know, you need to have financial assurance, and proof of financial assurance by an instrument that's illegal doesn't satisfy your obligation. So that would have to go through the NRC again, if there were actually a contract? It wouldn't have to go through the NRC. The NRC would enforce, pursuant to its enforcement program, the requirements of all licensees. So you're saying somebody would sue, and then it would come before the NRC, who would say that's not? That's one vehicle. I think another vehicle is a suit by someone who doesn't like this outcome under the Nuclear Waste Policy Act. There's a specific judicial review provision of the NWPA, and if someone wanted to make the assertion that, hey, DOE, you can't do that, it wouldn't necessarily be a case against the NRC. It would certainly be a judicial recourse in that circumstance. Even apart from the question of who might bring what lawsuit, your position is that notwithstanding the reference to government-owned waste in this condition, it would not be presently lawful for this licensee to make arrangements with regard to government-owned nuclear waste. That's correct, Your Honor. And the one point I'll make, too, in response to Judge Pan's question earlier, is that I think it is fair to say that the central premise of this license, as it's been presented to the agency and that the agency has based its evaluation on, is, in fact, that it will be storing spent fuels to which private entities, i.e., NRC, reactor licensees, currently own title and will continue to hold title. And if one were to look at, for example, the purpose and needs statement in the Environmental Impact Statement, you can see, this is on page 1070, you can see that the way that the agency has analyzed the project is in response to the demand of private fuel owners to have an off-site place to store spent fuel. I'm not talking about DOE taking title. I'm talking about private licensees doing something with the fuel that they currently own title to and continue to have title. Do you want to address that? Yes. So, do you agree with my prior line of questioning about focusing on the contention itself and its framing of what the central premise is? If we agree that this is not the central premise, isn't that reason in itself to uphold what the Commission did in this case? I think that's a fair conclusion. Yes, Your Honor. It's one of several, but it's certainly one of the ways the Court would rule and we would have no objections. And if we ruled that way, would we have to address all the ins and outs of this potentially illegal application of the license? I don't think the Court would, no. Because there was a statement that we would still have to decide the motion to dismiss and that we'd still have to get into these issues. What do you think of that? I don't know that the Court, I mean, first of all, let me back up on the motion to dismiss. There hasn't actually been any briefing about what the agency did wrong. I'm sorry, there hasn't, what? There hasn't been any briefing or any argument from beyond midway about, although they referenced the resolution of the motion to dismiss as one of the items that they're seeking review of, they haven't, in their brief, argued what it is that the agency did incorrectly. Now, we referred those arguments to the licensing board because that seemed like the appropriate thing to do. These are issues that we want to be able to adjudicate. The way we adjudicate things is through our 10-CFR2 process. So it seemed, the motion to dismiss isn't even something that's contemplated by the NRC's regulations. So in an effort to, if that's the word, arguments that have been raised, and to give persons an opportunity to be heard, we channeled those arguments to the NRC's. I plan on moving to the next page, unless you have any additional questions about the options there. Trouble with options. Let me move to the next, to the fast one. And the general theme of what I'd like to say is simply that the agency acted reasonably in ruling, as it did, that the contention that had been raised was both untimely, because the various facts that had been presented as new were in fact either, A, not new, or, B, certainly ascertainable from the existing record, and that, B, even if these arguments had been timely, they still wouldn't present an admissible contention. Let me focus on the latter first. I heard Mr. Tanner say earlier that the focus of the arguments that he wanted to make, and that distinguished his claim from those presented by the CR Club in Dove Heights, Michigan, and that had already been addressed by the Commission, were somehow pertaining to the local flavor of the impacts that were going to be experienced in terms of transportation to and from the interim storage facility. But the facts that Fasken has identified, that somehow opened up, opened Fasken's eyes to new information here, this is a fact that has to do with localized impacts. Rather, this is page 4-74 of the EIS, which is J1870. This comes in as part of the discussion about nationwide, what the impact of transportation to and from a consolidated interim storage facility will be. And it's talking about national impacts, or impacts on the nationwide shipments and fuels from Maine, Washington State, Florida, to Texas. And what's interesting about that is that that discussion has nothing to do with Texas or New Mexico or anything like that, but the nationwide shipments. In fact, the page in the draft EIS that was the basis for the motion to admit new information, which is page 4-75, actually says a few things. The first statement is that, well, we actually don't expect any additional significant costs to be incurred for emergency planning or emergency preparedness along this nationwide network. Because, in fact, those emergency preparedness costs are already being incurred by various states and municipalities as a consequence of the existing radioactive and hazardous shipping traffic across the nation. So we don't actually expect any additional costs. So to the extent that the assertion here is that, oh, there are going to be more costs, well, that's belied by the text of the provision itself that's passed in this reliance. The second point is really just that all that statement does is a statement that talks about what will happen if, in terms of alleged additional costs, what it's really saying is that, oh, we just want to point out that in the event that DOE were to ship her, i.e. in the event that we're talking about a national shipping campaign to Yucca Mountain, there will be grants available under the NWPA, the Nuclear Waste Policy Act, and these aren't NWPA shipments, so therefore there will be no additional grants. Those aren't the costs of this project. It's just pointing out that unlike a national shipping campaign to Yucca Mountain, these are going to be costs incurred, these will be costs that will be incurred by the shipments themselves. Essentially, there's no federal windfall, no federal capital, nothing more. It's certainly not a cost of efficiency, cost analysis related to this project, this particular project. Let me briefly reference some of the arguments that the Waste Michigan and Sierra made. Mr. Taylor referred to the arguments concerning transportation as the most important ones for us to consider. What I'd like to point out is simply that the argument to this board is simply that, well, the agency should have provided more, should have agreed more with the conclusions that his experts or the experts that he cited, rather than, and in particular, should have adopted the worst case scenario analysis that had been prepared in connection with the Yucca Mountain Act, and that it's somehow error for the agency to go with a different analysis. That's not an admissible criticism of an EIS, either before the agency or before this board. If we were reviewing the merits of the EIS, and it had said, agency had said, we have all these studies, and we don't find credible the competing study, or we're not going to do a worst case analysis or whatever, and we're reviewing for arbitrariness, you win, no doubt. But this is a different posture here. The question is, did that study create a genuine dispute of material fact, which seems to mirror summary judgment language, just for the limited purpose of being admitted into the record? If you think of it that way, and you posit different studies reaching different conclusions, and if the right analogy is to summary judgment standards in civil litigation, it should come in. Two points on it. First, I don't think that that's quite the proper analogy, and the commission— I'm not sure it is. I was just struck by the language in the reg that seemed patterned on Rule 56. It's similar to it, but I think it's important to stress that it's not. Now, the commission has—and this is in the same set of cases that I'll tell the commission's attention to disability standards— it wanted to make clear that a petitioner or an intervener has a burden that's more stringent than summary judgment in order to raise attention before the agency. And then again, those rules can be addressed and challenged on appeal and then confirmed. But what the commission's precedents have indicated—and this is what we said in our brief— and also what this court's precedents have indicated is that when you're coming in and challenging an analysis on an environmental impact case, it's not enough to just say, well, you should accept my people and disregard yours. You have to come in and actually say, what is wrong? Why would it be unreasonable for the agency to rely on the analysis that, in this case, the applicant provided? Why would it be wrong for the agency to rely on the analysis on an environmental impact case? It has to come in and say it would be unreasonable because of XYZ reasons. It has to come in and say that I have someone who knows what they're talking about, usually an expert, saying that this analysis is inaccurate and that it's flawed to a point. Mr. Tittle, anything further? Okay, thank you. Thank you. Thank you. Thank you to Court Broadside for intervening on our interim storage partners. Just a handful of things to go over. First, just a little bit of elaboration on your question, Judge Tittle, about the amounts. And it's true that 40,000 MTUs, metric tons of uranium, ultimately, potentially, of all cases play out. This particular license is 5,000 MTUs, and the joint attendance is 1969. So just that as a threshold. Still seems like a big number, but go ahead. A few words about the Nuclear Waste Policy Act argument. This license is not and should not be a mechanism to enforce DOE's compliance with the Nuclear Waste Policy. If DOE were to do what the petitioners are concerned about, enter into a contract with utilities or with ISP that they say violates the Nuclear Waste Policy Act, there is a ready-made mechanism to challenge it. The Nuclear Waste Policy Act itself contains traditional removal provisions. There's a number of cases out there, but the Alabama Power case in the 11th Circuit, 307 F. 3rd, 1300, is one of those. Almost the same situation here. DOE has entered into a contract there involving compensation. Allegations were that it violated the Act, and the 11th Circuit ultimately struck that down. That mechanism is in place. In response to some discussion about subverting, you know, should we just eliminate this issue, two reasons to not do that. One, it's not illegal for all the reasons we've described. This is not an authorization to do anything. This is a restriction on what can be done under this license. And secondly, it makes no sense. You know, some of the amicus of both AI and even the NRDC talk about all the bills that are floating around. I get these alerts. I'm sorry, the what? The bills introduced into Congress that are floating around. The possibility, you know, I don't think anyone in this courtroom would disagree that the nuclear waste program in the United States is broken, but there's always and continues to be efforts and, you know, potential to change that landscape. This is a years-long process, an expensive process. And to, if magically, or not so magically, but something happens to change the landscape, to say, well, okay, now you've got to go back and do it all over again, makes no sense. And, again, because of the lack of illegality and the lack of sensibility, we don't think there should be any new penciling put on with respect to the license. Final point on the nuclear waste policy act. There was some discussion about going back to the motion to dismiss and the original contentions. We did talk about that in some measure at pages 17 to 18 of our brief, the Interim Storage Partners brief. And the joint appendix at page 40 is the commission's treatment of that motion to dismiss. It was presumably a problem. So for that reason alone, if that's all that's left of the nuclear waste policy act arguments, that's yet another of what we think are many mechanisms to reject that part of the challenges here. Moving from that, unless you have any questions about the nuclear waste policy act, to the NEPA sort of violations, I think it's important to emphasize the standards here. In these types of cases, everyone always sorts of recites the standards review and then moves on. But when you look at, I think, and with all due respect, fairly, the allegations that are being made here, all of the things that are recited about the deferential standards review, NEPA is a series of judgment calls, to Duncan's point that was cited by the government. NEPA determinations are only reversible for a clear error of judgment. These are just disagreements about we wish you had done it a different way. This isn't the agency said black and the facts are white. This is judgment calls, and I would like to emphasize that the traditional deference applied in these sorts of situations is outcome determined. I take your point, but what's your answer to my question that all of that said, the bar should be a good bit lower when the question is simply whether the submission should be admitted into the record? Two responses to that, if I may. First, I would agree with a government counsel. By design, it's not a summary judgment. It's not a low bar. It's by design. And secondly, the rules are not on trial here. The NRC's rules have been ratified over and over and over again by this court. There's a way that you could challenge this. You could petition for a rule change. There's all sorts of ways to do that. But the only thing that's at issue in this case is whether the agency reasonably applied its rules. And the rules, we suggest, are crystal clear. And when you frame it in that way, I think, again, the deference owed to the agency here is very unlike the sort of, well, is there a possibility for disagreement? That is not the standard. So moving on from the standards, I really just have one more point with respect to the fasking arguments. Mr. Keener asked, well, how was I to know? How was I to know that there might be private storage here, I'm sorry, private transportation here without the backing of DOE funding? Well, the answer to that is in the environmental report itself, page 767 of the joint appendix. And that talks about if DOE is involved, there will be funding. Obviously, it's crystal clear from that recitation that that wasn't the only type of transportation. So unless there are further questions, those are the points I wanted to make. Thank you. Thank you. Thank you. I'd like to make two points. In response to Judge Pan, I just want to clarify that we did not concede that our contention was properly dismissed. The issue of ownership and responsibility for the cost of storing spent fuel is central. That the inclusion of any language in that license condition has to be read. All language is central to that license condition. It may be the most important thing in a license. Who gets the bill for this spent fuel if there are problems with this facility? And I think MSP would agree this is an extraordinarily important matter. If I can ask you then, the language was the central premise of ISP's application is that the U.S. Department of Energy will be responsible for spent fuel that is transported to and stored at the proposed interim facility. That's absolutely true, Your Honor. But this ignores that there's an alternative way to do it, which is through the privately owned. As long as the DOE is in there, you must assume that the DOE will be the owner. Why? Why must I assume that? Because that is how the license is written. Or means it could be one party or it could be the other. And it's just as likely to be the federal government the way this license is written. All of the assertions about how this isn't going to happen are outside the scope of the license. There are two alternatives. One is lawful. One is unlawful. Presently unlawful. Why would we assume that that will shake out with the unlawful alternative? Because the administrative procedure... Especially since that's what the government has told us. Why is the NRC issuing a license it knows has an unlawful provision? That's the first question. Why are we having to litigate whether it's okay to put unlawful language in a license and say, no problem here. As Mr. Stagg said, why would we, you know, why waste our time? So I think we should amend the license. I understand your position, but I think that you did not reflect your position in your contention. So I think that your contention fails on its face. Donna, I respectfully disagree because every term in that license is essential. The DOE, the fact that there's unlawful language in a license doesn't excuse the unlawful language. That is also clearly established in the court. None of the language in the license must be considered central. Well, why would you use the word central if every word is central? Because it is a central issue in this license. Who gets liability for this spent bill? That is one of the important conditions in the license. Okay. And I would just... Thank you, Mr. Brown. Could I add one more? Briefly. Point. To Judge Cato, as why can't we rely on the assurances of the court that you would not let this condition be fulfilled? Again, a basic question is why we're jumping over hurdles to legitimate the unlawful language. We understand that. Thank you very much. Thank you very much. I can hopefully clarify Judge Cato's questions about whether this is like summary judgment or not. It is not. The contention admission process is more like notice pleading and motion to dismiss. You think it's even a lower burden? Pardon? You think the burden is even lower in this context? Oh, yeah. And, in fact, the NIC regs provide for a summary disposition after the condition is admitted and there's some record made. What do you do with the cases? I'm just looking at the cases cited at page 52 of the red brief. We have a fair number of cases suggesting that even at this admissibility stage, the proponent of the evidence has to not merely suggest other ways this might have been done but point to a deficiency. Well, first of all, I think we did more than that by presenting our expert testimony and the evidence we presented. We have put in our additional brief under standard of review cases from the agency itself indicating that the NRC has determined that the burden on a petitioner in stating its contentions is not heavy. It's simply insisting upon some reasonably specific factual and legal basis for the contention and that the petitions are required only to articulate at the outset the specific issues they wish to litigate. Petitioner only needs to come forward with factual issues, not merely conclusive statements and vague allegations. And there is a Supreme Court case we cited, Vermont Yankee versus NRDC, that says that the intervener simply must make the showing sufficient to require reasonable minds to inquire further. I think we've done that. And just as the court can rule on a motion to dismiss at the pleading stage, I think you can rule here. I think you have the jurisdiction to do that. Thank you. Nothing else. Thank you. Thank you, Your Honors. A fair reading of the facts and contention would include all of the information contained in the Taylor affidavit, the motion itself, as well as the words of the contention itself. It does have a local flavor. We focus primarily on local issues, but the NRC is saying is, well, but we don't deny that there are some national facts here. Remember, the environmental report and the EIS talk about safe transportation nationwide, not talk about local situation. And they do it based on DOE shipments 100%. Can I ask you about that? Because looking at JA-767, the environmental report says, if the DOE is the shipper, the federal government through DOE is responsible for providing emergency training to states, tribes, and local emergency responders along the transportation routes where SNF would be transported to the EISF. But isn't that by implication, if DOE is not the shipper? I mean, this leaves that open. So why isn't that ascertainable to you? Why didn't you take that in response to the environmental report? Okay, fair enough. It's not, because if DOE does this and they say nothing about the other scenario, and if all of the safety data is based on DOE shipments in the past, then I don't think a reasonable person should read into the if, all of this other stuff. But the implication is DOE isn't always the shipper. If DOE is the shipper, this happens. I think it's ascertainable that there may be instances where DOE is not the shipper. Why are you not on notice that that could happen? I think it's ascertainable that the privately titled waste will be shipped. But the question is, who will ship it? And under what standards? Nothing is said in the DEIS or the environmental report other than referencing these studies based on DOE's shipping standards, which I think we all agree are elevated, what the NRC could do. But we haven't been told what they're going to do here. I don't think it goes that far. And I think that the issue focuses on the information. I mean, there's no reference to ascertainability in the order. The order down with feelings typically says, you know, the language is different. So let's just talk about two things. Let's talk about material differences and let's talk about local emergency issues being beyond the scope of what we're doing. And I think that's what we focus on and we need to focus on here. I would say that the agency can't ignore its own site-specific rules. And finally, this whole premise is the agency ignoring all of its rules about ISFSI, all of its rules about MRXs, creating a new situation to move virtually all the nation's SFF into the two facilities without any of the security that we would have had in a place like Yucca Mountain. And they do it with this whole new thing that keeps changing. That's extraordinary, I think, by any – and it's worth noting, every single contention was rejected in this case. That's unprecedented. Over 2,800 comments were basically ignored because the final EIS didn't reflect any changes from the original EIS. That is not how the agency and the public deserve to have this kind of decision made. Thank you. Those are the questions. Thank you. Thank you. Thanks to all counsel. The case is submitted.
judges: Katsas, Pan, Tatel